Curran's Estate

The facts appear from the adjudication of

SINKLER, J., Auditing Judge.—The testator died May 4, 1907, and, after making certain pecuniary bequests, bequeathed to the Fidelity Trust Company of Philadelphia and his son-in-law, William M. Davison, Jr., $100,000 in trust to pay over the income to his adopted daughter, Constance L. Davison, during her life, and a like amount to The Pennsylvania Company for Insurances on Lives and Granting Annuities and his said son-in-law, William M. Davison, Jr., in trust, for the same purpose. She is given the power to dispose of both of the principal sums by will. The residue of his estate is given in equal parts to his son-in-law, William M. Davison, Jr., and the Fidelity Trust Company of Philadelphia as to one-half part, and to his said son-in-law and The Pennsylvania Company for Insurances on Lives and Granting Annuities as to the other part, to be held in trust, "to invest it in good securities," and to pay the income to his wife, Lillie H. Curran, during her life. The will proceeds:

"And I do hereby authorize and empower my said wife, Lillie H. Curran, to dispose of both of said principal sums, so held in trust, by her will or writing in nature thereof, as she may desire or see fit."

Provision is made for the failure of either his wife or his adopted daughter to exercise the power of appointment given them.

The present accounting is of one-half of the residuary estate given by the testator to the trustees, William M. Davison, Jr., and The Pennsylvania Company for Insurances on Lives and Granting Annuities, in trust for his widow, Lillie H. Curran.

Lillie H. Curran, the widow of the testator, made her last will, containing a number of pecuniary bequests, among them a legacy of $50,000 to Laura L. Hill. The residue is appointed in equal portions to the said Laura L. Hill, of Merchantville, N. J., and Harriet L. Huntley, of Germantown, Philadelphia, Pa.

Formal exceptions to the account were filed in behalf of Laura L. Hill, to whom one-half of the residuary estate was appointed by Lillie H. Curran, widow of the decedent, donee of a general power of appointment. Subsequently the auditing judge was informed that most of the exceptions had been withdrawn, and there remain for consideration by him only the questions whether the trustees should be surcharged for investing funds of the trust estate in securities known as Forrest Theatre first mortgage 6s due February 1, 1934, and whether they should be surcharged for retaining certain bonds purchased by the decedent during his lifetime.

Whether the trustees should be surcharged for investing funds of the trust estate in the Forrest Theatre bonds raises a question which, according to counsel for both the exceptant and the accountant, is a novel one—to wit, whether bonds of this class are legal investments for trust funds. Mr. Hermes, in his carefully prepared brief, rests his contention upon the ground that the creation of the mortgage by an individual to whom the premises were conveyed for that purpose, and who, immediately after the execution of the mortgage, reconveyed the premises to a corporation, constituted an evasion of the law in that the bonds are essentially those of a private corporation; that the indenture of mortgage securing the issue of bonds is a departure from the ordinary form of bond and mortgage; that the holder has surrendered his individual right of action; that the bonds are under the indenture payable to bearer, except when registered; that they are transferable by delivery, not by assignment; that in the event of default the trustee alone is entitled to foreclose, and that the trustee need not foreclose unless twenty per cent. of the holders of the bonds press for such action.

Mr. Remick, counsel for one of the accountants, contends that this method of creating an issue of bonds does not constitute an evasion of the Constitution and laws of the Commonwealth, but, on the contrary, that it is a bona fide attempt to comply with the statute and constitutional provision. This argument impresses the auditing judge as sound. He also argues that the sanction of time is as potent an authority in favor of the legality of this form of investment as judicial decision. This argument has little weight.

1. To determine whether a bond of the class in which the Forrest Theatre bond falls is a legal investment for trust funds involves consideration of the constitutionality of the Act of Assembly of June 29, 1923, P. L. 955, amending section forty-one of the Fiduciaries Act of 1917, which is as follows:

"Section 41. (a) 1. When a fiduciary shall have in his hands any moneys, the principal or capital whereof is to remain for a time in his possession or under his control, and the interest, profits, or income whereof are to be paid away or to accumulate, or when the income of real estate shall be more than sufficient for the purpose of the trust, such fiduciary may invest such moneys in the stock or public debt of the United States, or in the public debt of this Commonwealth, or in bonds or certificates of debt now created or hereafter to be created and issued according to law by any of the counties, cities, boroughs, townships, school districts, or poor districts of this Commonwealth, or in bonds of one or more individuals secured by mortgage on real estate in this Commonwealth, which may be either a single bond secured by a mortgage or one or more bonds of an issue of bonds secured by mortgage or deed of trust to a trustee for the benefit of all bondholders, or in ground rents in this Commonwealth: Provided, that nothing herein contained shall authorize any fiduciary to make any investment contrary to the directions contained in the will of the decedent in regard to the investment of such moneys."

This act is an amendment of section 41 (a) of the Fiduciaries Act of June 7, 1917, P. L. 447. The subsequent amendment by the Act of April 26, 1929, P. L. 817, is not before me for consideration, forasmuch as the indenture of mortgage which secures the issue of the Forrest Theatre bonds was dated prior to the enactment thereof, to wit, February 1, 1929.

In my opinion, the act as amended, just quoted, does not violate the constitutional restriction either in letter or in spirit.

Article III, Sec. 22, of the Constitution of Pennsylvania is as follows:

"No act of the General Assembly shall authorize the investment of trust funds by executors, administrators, guardians or other trustees, in the bonds or stock of any private corporation, and such acts now existing are avoided saving investments heretofore made."

The legislative provision, as amended by the Act of 1923, authorizes the investment of trust funds in bonds of one or more individuals secured by mortgage within this state. The bonds may be either a single bond secured by a mortgage, or one or more bonds of an issue of bonds secured by mortgage or deed of trust to a trustee, but in either case must be bonds of one or more individuals. The letter of the constitutional provisions prohibits the investment of trust funds in the stock or bonds of a private corporation. It is, therefore, too plain for elucidation that the letter of the constitutional provision is not violated.

Mr. Hermes cites the following from the opinion of Mr. Chief Justice Tilghman in Farmers' and Mechanics' Bank v. Smith, 3 S. & R. 63:

"But where multitudes are affected by the construction of an instrument, great regard should be paid to *spirit*, and *intention*." (The italics are in the opinion as reported.)

For the purpose of ascertaining the spirit and intention of the constitutional provision under consideration, the debates of the Constitutional Convention upon the subject have been examined.

The debates disclose that prior to 1870 trustees were limited in their investments to loans of the United States, of the State of Pennsylvania and of the City of Philadelphia, and mortgages on real estate. From time to time public loans of other municipalities in the state were added because it was supposed that trustees residing in the vicinity of such municipalities might prefer those investments to obligations of municipalities at a distance from them.

In 1870 a totally different policy was inaugurated by the legislature. An act of assembly was passed in that year, enacting that bonds of the Pennsylvania Railroad, secured by its general mortgage dated July 1, 1867, should be a legal investment for trust funds.

In 1872 a like enactment was made with respect to the bonds of the Philadelphia & Reading Railroad Company secured by its general mortgage.

"It requires no very prophetic eye to see, that once a change so radical is made in our law, trustees will be authorized to invest in the bonds and probably in the stock of all favorite private corporations, or rather private corporations favored by the Legislature; and thus the very security which was intended by the limitation passed half a century ago, will be entirely defeated:" 2 Debates Constitutional Covention of Pennsylvania, 745.

The proceedings of the Constitutional Convention make it evident that the article of the Constitution in question was intended to limit legal investments to bonds of the Federal and state governments, municipalities, etc., within the state, mortgages and ground rents; and that investments other than those in bonds of the classes prescribed should be secured by mortgage on real estate.

The proceedings reveal the mischief which the constitutional restriction was intended to avert—the investment of trust funds in the obligations of corporations engaged in what was then considered a hazardous business, to wit, the construction and operation of railroads. The conditions existing throughout the United States at the time the Constitutional Convention met were such as to cause lack of confidence in railroads and industrial enterprises. In Adams' "Epic of America" it is related that in 1873, one year before the adoption of our present Constitution, 89 railroad companies in this country were in the hands of receivers; 300 out of 700 iron and steel plants throughout the country were closed; and 5000 commercial houses failed. The Constitutional Convention found the most effective way to prevent the investment in such hazardous enterprises was to prohibit the investment of trust funds in securities of private corporations, the usual media of such enterprises.

There is nothing to be found in the constitutional restriction which prohibits the investment of trust funds in bonds secured according to the amendment contained in the Act of 1923. Neither according to the letter nor the spirit thereof does the issue of bonds of individuals secured by a mortgage or deed of trust to a trustee for the benefit of bondholders violate the constitutional provision. The Act of 1923 is constitutional, and bonds issued according to the terms of the act are legal investments for trust funds.

2. Whether the trustees should be surcharged because they invested funds of the trust estate in Forrest Theatre bonds should be determined not upon the validity of the bond as a legal investment for trust funds, but upon the degree of care exercised by them in ascertaining the status of the bond in that respect.

Whether or not the trustees exercised the required degree of prudence and judgment in the selection of the Forrest Theatre bonds for investment, is the

precise question to be adjudicated. Several elements enter into the exercise of such prudence and judgment, one of which is the dependence by trustees upon the opinion of counsel that the issue of bonds was a legal investment for trust funds. This, in turn, involves an examination by the auditing judge of the issue of bonds to determine whether the opinion of counsel was apparently correct or in manifest error.

There has been submitted to me the opinion of Saul, Ewing, Remick & Saul, addressed to The Pennsylvania Company for Insurances on Lives and Granting Annuities, upon the mortgage given by Harry J. Ulrich to the company, secured upon premises Nos. 1106-14 Walnut Street and No. 209 Quince Street, known as the Forrest Theatre. This opinion is in the form that is usually rendered by counsel upon an issue of bonds, and includes the following clause:

"In our opinion, the bonds when executed and certified as aforesaid will be legal investments for trust funds in Pennsylvania."

Such opinion as that under consideration is invariably rendered upon any security offered for sale to the public, by counsel specially versed in the law and proceedings relating to the issuance of securities. A distinction is to be made between such an opinion rendered to a trustee under a trust indenture, or the bankers who offer the securities for sale, from advice given by an attorney to a client. In my opinion, the trustees in the present case did not fail to exercise due care in relying upon the opinion of counsel that the bonds were a legal investment for trust funds. Unless there exists lack of good faith or unless the security upon its face is obviously not of the class known as legal investments for trust funds, the opinion of counsel justified the trustees in believing the bonds were a legal investment. There is no charge by the exceptant of lack of good faith on the part of the trustees in this respect, and the auditing judge has only to determine whether the bonds upon their face are not what the opinion of counsel declares them to be.

An examination of the form of bond and of the trust indenture and mortgage securing the bonds does not convince me that there is error in the opinion of counsel. There is nothing in the statute nor in the constitutional provision relating to the investment of trust funds which requires that the bond shall be a single one in the form generally known as sci. fa. bond secured by a mortgage in the stereotyped form. Nor is anything to be found in the Constitution or statutes which requires that the remedy in case of default shall be pursued in any particular manner. Should trust funds be invested in bonds of the Federal Government or state, there is no remedy in the event of default, for a sovereign power may not be sued without its consent. That the bonds and mortgages securing them were executed by what Mr. Hermes described as a strawman, does not, in my opinion, make the bonds essentially those of a private corporation, as he argues, such as to violate the constitutional restriction. The clear purpose of this article of the Constitution was to preserve for trust funds the security of a mortgage upon real estate, unless invested in the other classes of bonds specified.

The trustees have not shown lack of the prudence required of them by law in relying upon the opinion of counsel that the bonds in question are legal investments for the funds of their trust estate.

3. The exceptant charges the trustees with having failed to exercise common skill and prudence in other respects, in the purchase of Forrest Theatre first mortgage 6s bonds.

The mortgaged premises were valued, it is argued, at a figure slightly in excess of that which would permit the mortgage to be a legal investment for trust funds under the act of assembly; neither the trustees nor the appraisers

had any knowledge of the earnings of the property; the mortgaged premises were what is known as a specialty property, used for one particular branch of industry and no other—ordinarily an undesirable investment for trust funds.

(a) There is no provision in the Act of 1923, supra, as to the ratio which shall exist between the value of the mortgaged premises and the mortgage debt. The Act of 1929 restricts the mortgage to two-thirds of the fair value of the real estate, but this amendment had not been enacted when the mortgage in question was created. The testimony before me is to the effect that the mortgaged premises were worth $1,050,000 at the time the mortgage was executed, and $960,000 at the present time. The mortgage was for slightly less then sixty per cent. of the value placed upon the property at the time it was executed, and the trustees, in my opinion, have exercised common prudence and skill in obtaining necessary information as to the value of the property.

(b) Counsel for the exceptant quoted from the opinion of the Supreme Court in Hart's Estate (No. 1), 203 Pa. 480, upon the question of what he described as specialty properties. The mortgage there was on a manufacturing plant in another state; the trustee was not present when the mortgage was taken, and he seems to have made no effort to inform himself as to the value or earning power of the property.

In a sense, a theatre building may be regarded as a specialty property. For more than two thousand years the theatre has been a place of amusement and education, and plays written by the Greek dramatists are produced at this time. The structural design has been substantially unchanged for centuries. The theatre of the Greeks is the basis for the modern theatre. In the Elizabethan era plays were given in the courtyard of inns. The second-story galleries of the inns were the prototype of the balconies of the modern theatre. These two types of buildings have resulted in the modern theatre, which has been substantially unchanged for centuries. Although the form of structure of many other buildings has been radically changed, that of the theatre is essentially unaltered.

Therefore, the theatre, while in a sense a specialty property, is not ephemeral in its nature. The purchase of bonds secured upon such a property does not indicate lack of wise judgment in investment of funds of the trust estate.

(c) After the briefs of argument had been submitted to the auditing judge, it appeared that no evidence had been produced showing what efforts had been made by the trustees to learn the earnings or earning power of the Forrest Theatre. Therefore, on June 8, 1932, at the request of the auditing judge, Frank G. Sayre, Esq., Vice President of The Pennsylvania Company for Insurances on Lives and Granting Annuities, was called as a witness to testify on this subject. The theatre building, it appears, was completed in May of 1928, while the mortgage was executed about nine months later. The earnings for this period would, therefore, have been available. The trustees depended upon the guaranty of the Shubert Theatre Corporation. The Forrest Theatre, it was testified, was one of a system of theatres in this and other cities operated by the Shubert Theatre Corporation. Mr. Sayre testified that the balance sheet and statement of assets and liabilities of the Shubert Theatre Corporation were taken into consideration, as well as its earnings, and that the trustees relied upon the earnings of the guarantor corporation, rather than upon the earnings of this particular theatre. In my opinion, the trustees did not fail to exercise the required care in this particular.

The trustees exercised the required prudence in investing funds of the trust estate in bonds of the Forrest Theatre, taking into consideration the value of

the mortgaged premises, the purpose for which the premises were used, and the resources and earnings of the guarantor corporation.

4. The exceptant asks that the trustees be surcharged because of depreciation in the value of certain securities owned by the decedent at the time of his death and retained by them as investments for the trust estate. It is argued in her behalf that, under the terms of the testator's will, the trustees had no power to invest in other than legal investments for trust funds as defined by the Constitution and laws of this state, and that, under the decision of the Supreme Court in Taylor's Estate, 277 Pa. 518, the trustees should have converted such securities as were not legal investments for trust funds within a reasonable time after the securities came into their possession.

One-half of the residuary estate is given to the trustees "to hold the same In Trust, invest it in good securities and pay the interest or income thereof, semiannually to my wife Lillie H. Curran during her life." This direction to invest in good securities has been the subject of judicial interpretation in Plate's Estate, 30 Dist. R. 902, and defined to mean legal investment for trust funds.

There were awarded to the trustees on the adjudication of the executors' account the following securities which had been purchased by the testator during his lifetime: 1000 Pittsburgh, Bessemer & Lake Erie Railroad Company 5s due January 1, 1947, $1140; 1000 Grand Rapids & Indiana Railroad Company 4½s due July 1, 1941, $1050; 3000 Buffalo, Rochester & Pittsburgh Railway Company Equipment 4½s "D" due November 1, 1919, $3000; 2000 Buffalo, Rochester & Pittsburgh Railway Company Equipment 4½s "F" due November 1, 1927, $2000; 1000 Kings County Elevated Railroad first mortgage 4s due August 1, 1949, $870; 5000 New York, Brooklyn & Manhattan Beach Railway Company first 5s due October 1, 1935, $5250; 5000 West End Traction Company 5s due January 1, 1938, $5600.

The interest on all of these securities is being paid at the present time. The present market value is substantially less than the appraised value. It appears, as to certain of these securities, that the market price thereof during the time the trustees held them was greater than the face value and greater than the appraised value.

In Taylor's Estate, supra, relied upon by the claimant, the Supreme Court held that where "no discretionary power is given by the will to invest in nonlegal securities, the trustee has no power to continue such investments beyond a reasonable time for conversion and investment in legal securities, unless he shows that his retention of the nonlegal securities represents not a mere lack of attention, but the honest exercise of normally good judgment, based on actual consideration of existing conditions."

Mr. Davison, one of the trustees, was examined at considerable length and testified that he constantly visited the officers of his cotrustee company and discussed the advisability of retaining these and other securities held by the trust estate. Certain of the securities, as shown by the account, were sold. Those that were retained were not sold when the opportunity was available for various reasons, chiefly because of the low rate of interest that would be obtainable if the proceeds of the sale were reinvested in securities to which by law the trustees would be restricted. Interest has been paid as it fell due upon all of the bonds which have been retained by the trustees except the West End Traction bonds, which defaulted in the payment of interest several years ago, but subsequently remedied the default by payment.

Mr. Davison investigated the rating of the securities left by the testator in Moody's Manual, and all of them had a high rating, some of them being known as triple A bonds. He testified that the trustees decided not to sell the securities

in question when they declined in price unless it looked as though it was advantageous to the estate; that the trustees dealt with the securities in this estate just exactly the same as he dealt with the securities of his own; that he occasionally called at the office of Mr. Gates, one of the officers of his cotrustee company, on certain mornings of the week in order to examine the list of mortgages which were offered to the trustees as an investment; and that there has not been a single foreclosure in the twenty-five years in which the trust estate was managed.

In the opinion of Kephart, J., in Brown's Estate, 287 Pa. 499, it is held that:

"The judgment of a fiduciary acting in good faith on considered circumstances should have controlling effect as to the time of sale of the particular investment. . . .

"The rule is, What would a prudent man ordinarily do if a similar situation confronted the disposition of his personal affairs? While over-exacting solicitude is not required, carelessness or disregard of the welfare of the estate will not be permitted."

In Keller's Appeal, 8 Pa. 288, the Supreme Court of this state, by Coulter, J., strikingly defines the rule of accountability applicable to fiduciaries. The precise limitations, he says, cannot be definitely defined in their application to particular cases. "Much must be left to the discretion of the courts, who will duly estimate the lights and shadows of cases as they arise, and with careful hand adjust acknowledged principles to the case . . . . a court of chancery always deals with great tenderness towards a trustee acting in good faith."

This rule is appropriate under existing conditions, when values of property and commodities of every kind throughout the civilized world are disturbed. Obligations of many foreign countries are in default, as are the obligations of certain public corporations within this country. Upon the audit of many accounts filed in this court, it is disclosed that a substantial part of the first mortgages held as investments are in default in payment of interest. Sheriff's sales on proceedings to foreclose mortgages in this city far exceed anything heretofore known. Some issues of bonds of the City of Philadelphia are selling at eighty per cent. of their par value. Under such conditions, increased vigilance may be required of those in a fiduciary position, but there should be no departure from the rule upon the treatment to be given conscientious trustees as enunciated by the Supreme Court of this state eighty-five years ago.

Such is undoubtedly the wise policy of the law, provided care and attention are given by the trustee to the administration of his trust estate. Neglect or inattention is the unforgivable sin in the eyes of the law.

In the present case, the only evidence before me is that the trustees had frequently under consideration the question of selling the securities which had been received from the testator and the reinvestment thereof in legal investments for trust funds. Certain securities were sold and reinvested. Certain others were held for reasons which, in their judgment, rendered it to the best interests of the estate that the securities should not be sold.

Frequently, trustees are confronted with a conflict between the interests of life tenants and remaindermen. Ordinarily, a trustee should seek to keep his administration nicely balanced between the two interests, and not administer the estate to the advantage of one at the cost of the other. In the present case, the only individual named by the testator to enjoy his bounty is Lillie H. Curran, his wife, who is given a life interest with an unlimited power of appointment. Under the decision of Lyon v. Alexander, infra, she was in effect the absolute owner. Therefore, in the administration of this trust estate, the trustees were justified in considering her interest of paramount importance.

According to the testimony of Mr. Davison, the retention of the investments in question was in order to maintain a higher rate of interest than could have been obtained upon selling the securities and reinvesting the proceeds in mortgages. By retaining the securities, a judicious diversification in investments would also be maintained which could not be obtained in reinvesting; likewise, reasonable certainty in the payment of the income and that the interest as it fell due would be paid promptly.

As has been said above, none of the securities in question are in default in the payment of interest. A favorable comparison may be made in this respect with the great majority of mortgages accounted for in this court. In almost every estate a considerable part of the mortgages in which trust funds are invested is in default in the payment of interest or taxes.

The evidence before me as to the management of the trust estate discloses neither neglect nor inattention on the part of the trustees. The retention of the securities in question was the result of the exercise of their sound judgment—the outcome of frequent consultations. That some of the securities retained by the trustees have declined in market value, as is the case with almost all securities at the present time, is not a sufficient ground for surcharging the trustees with the difference between the maximum price for the securities during the time in which they were held and the present market value thereof. This claim for a surcharge is, therefore, dismissed.

5. The concluding argument in behalf of the trustees is that Lillie H. Curran, the life tenant and donee of the power of appointment, had full knowledge of all investments held or made by the trustees, that she herself was estopped from raising any objection to the retention of certain investments, or the making of certain other investments, and that her appointee is bound by her estoppel. The trustees rely upon Clermontel's Estate, 12 Phila. 139, Welsh's Estate, 22 Dist. R. 401, and Lyon v. Alexander, 304 Pa. 288. In the last of these cases the Supreme Court held that where a power of appointment is a general one, under which the donee may appoint to anyone, the testator has completely relinquished all dead-hand dominion over the property and has placed it for all practical purposes as completely within the control of the donee of the power as though a fee had been created in him.

In the present case, Lillie H. Curran, widow of the testator, had an unlimited power of appointment which she appointed in part to Laura L. Hill, as above recited, and the rule of law as set forth by the Supreme Court seems applicable, therefore, to the present case.

Evidence has been produced that a letter was written by an officer of The Pennsylvania Company for Insurances on Lives and Granting Annuities on September 16, 1925, to Lillie H. Curran, the life tenant, advising her that certain securities held by the trustees were what are known as nonlegal investments for trust funds. There is no positive proof that this letter was received. There is evidence before me that each year from 1909 to October 3, 1930, Lillie H. Curran was furnished with an annual report of the income received and distributed, showing the sale of investments that had occurred each year during the period. The argument of the accountants that her acquiescence in the retention of these investments would preclude her from making any objection thereto is well founded, and may be extended to the object of her bounty, whose rights can rise no higher than could those of her benefactress. This is a sound defense, but the auditing judge has considered it advisable to pass upon the merits of the exceptions of Laura L. Hill.

The following are the conclusions of the auditing judge:

1. The Act of Assembly of June 29, 1923, P. L. 955, authorizing the investment of funds of trust estates in the bond or bonds of individuals secured by a mortgage to a trustee does not violate article three, section twenty-two, of the Constitution of Pennsylvania, and bonds issued in accordance with the provisions of this act of assembly are legal investments for trust funds.

2. The trustees, in relying upon the opinion of counsel that the bonds of the Forrest Theatre were a legal investment for trust funds, did not fail to exercise the required care and prudence.

3. The trustees, in relying upon the valuation of the mortgaged premises securing the Forrest Theatre bonds, in relying upon the financial standing and earnings of the guarantor corporation, and in the investment of trust funds in a mortgage secured upon a specialty property, did not fail to exercise the care and prudence required of them by law.

4. The trustees did not fail in the proper administration of their trust estate by reason of retaining certain securities owned by the decedent at the time of his death.

5. The fact that the life tenant did not request the trustees to sell the securities retained by them, and reinvest the proceeds in legal investments for trust estates, precludes the exceptant, her appointee, from holding the trustees responsible for such failure to convert.

All requests to surcharge the trustees are refused.

A further question arose at the audit, whether the trust fund should be awarded directly to the appointees under Mrs. Curran's will, or to John C. Knox, her executor. A similar question arose before Judge Henderson at the audit of the account of the Fidelity-Philadelphia Trust Company and William M. Davison, Jr., trustees for Mrs. Curran of the other half of the residuary estate, and in the adjudication filed September 23, 1931, Judge Henderson awarded the fund "to the executor of the will of Lillie H. Curran, at the audit of whose account it will be determined whether the appointed estate is subject to her debts, legacies and inheritance tax. The executor is directed to keep the funds segregated from the individual estate of the testatrix." This adjudication is controlling in the present case, and the fund will, therefore, be awarded to the executor of the will of Lillie H. Curran, deceased, to be kept segregated from her individual estate, so that the question can be determined whether the appointed estate is subject to her debts, legacies and inheritance tax.

*Nathan Griffith, Bryan A. Hermes* and *Alfred J. Snyder*, for exceptant.

*Elmer C. Pfeiffer, Saul, Ewing, Remick & Saul* and *Acker, Manning & Brown*, contra.

HENDERSON, J., November 22, 1932.—Little need be added to the painstaking adjudication of the auditing judge. Five questions are raised by the exceptions: (1) Should the fund be awarded directly to the appointees or to the executor of the appointor; (2) should the accountant be surcharged for retaining nonlegal securities; (3) did the payment of a fee for registration to the trustee under the mortgage deed enable the appointee to repudiate the investment; (4) the security of the Ulrich bonds, and (5) the validity of the Ulrich (Forrest Theatre) bonds and mortgage as a legal investment for a trust estate.

1. To whom should this fund be awarded?

The testator bequeathed this fund in trust for his widow for life and gave her an absolute power to appoint the same by will. Her will made no specific disposition thereof; hence, the power was exercised by implication under the Wills Act of June 7, 1917, P. L. 403, Sec. 11, and passed under the provisions of her will. Therein she directed the payment of debts, made numerous bequests,

individual and charitable, aggregating more than $200,000, and gave the residue equally to Miss Harriet L. Huntley and Mrs. Laura L. Hill, exceptant.

The auditing judge awarded the fund to the executor under the will of the appointor and directed it be kept segregated from her individual estate so that at the audit thereof it can be determined whether the appointed estate is subject to her debts, legacies and estate and inheritance taxes. This is our usual practice. Creditors are not now before us, and they have a right to be heard on these questions.

In Booth's Estate, 8 D. & C. 116, we said:

"We are of opinion that we should not at present decide whether the appointed estate is or is not liable for the debts of the donee, or for inheritance tax, as part of the donee's individual estate. The possible creditors of the donee are not before us, and, in accordance with our usual and safer practice in such cases as this, the exceptions must be dismissed. The executors of the donee, in filing their account, will segregate the assets now awarded, and, at the audit of their account, the questions may be determined which were discussed at the argument. This practice is illustrated in Brown's Estate, 17 Dist. R. 569, Fisher's Estate, 16 Dist. R. 151, Sparks's Estate, 30 Dist. R. 815, and McCord's Estate, 276 Pa. 459, and is referred to in Mitchell's Estate, 7 D. & C. 387; so that this award, being made purely for administrative purposes, is without prejudice to the rights of any person interested as they may appear at the audit of the executors' account. The liability of the appointed estate for the debts of the donee, referred to in the adjudication, need not be determined at present." See, also, Kates's Estate, 282 Pa. 417, 425.

2. Should the accountant be surcharged for retaining nonlegal securities?

Eighteen thousand dollars in bonds, purchased by the decedent, were awarded to these trustees from the executor's account, and while they have depreciated in value, there is no default in the interest of any of them.

The rule as to the retention of nonlegal investments will be found in Taylor's Estate, 277 Pa. 518, wherein our Supreme Court held that where "no discretionary power is given by the will to invest in nonlegal securities, the trustee has no power to continue such investments beyond a reasonable time for conversion and investment in legal securities, unless he shows that his retention of the nonlegal securities represents not a mere lack of attention, but the honest exercise of normally good judgment, based on actual consideration of existing conditions."

In dismissing this request for a surcharge, the auditing judge said:

"The evidence before me as to the management of the trust estate discloses neither neglect nor inattention on the part of the trustees. The retention of the securities in question was the result of the exercise of their sound judgment— the outcome of frequent consultations. That some of the securities retained by the trustees have declined in market value, as is the case with almost all securities at the present time, is not a sufficient ground for surcharging the trustees with the difference between the maximum price for the securities during the time in which they were held and the present market value thereof. This claim for a surcharge is, therefore, dismissed."

This finding of fact is amply supported by the testimony and will not be disturbed except for manifest error.

Furthermore, the widow, who had an absolute power of appointment, was furnished with an annual report of the income and never complained as to the retention of these securities; hence, she would be precluded from objecting to their retention. The exceptant who stands in the shoes of her donor is likewise estopped.

A similar situation arose in Clermontel's Estate, 12 Phila. 139, wherein Judge Ashman of this court said:

"The legatees who now make complaint take under the will of Joseph Fleming, but only by virtue of the power of appointment exercised in their favor by the present testatrix. They are absolute strangers to the original estate, and owe their interest therein solely to the bounty of the donee of the power. The latter, by her own acts in her lifetime, was estopped from complaining of the action of the accountant, and it is monstrous to assume a greater privilege for her beneficiaries. In objecting to these investments, they will, if successful, enlarge the estate which they derive from the bounty of the testatrix by discrediting her acts in connection with that estate. There is nothing in the case which impugns the good faith, or even the judgment, of the accountant, and this exception, as well as that to the allowance of commissions, is dismissed."

3. Did the payment to the trustee of the mortgage deed, who was also one of the trustees of this estate, enable the appointee to repudiate the investment of the Forrest Theatre bonds? This question was not raised at the audit.

It appears that when Ulrich created the bond issue (secured on the Forrest Theatre), he appointed The Pennsylvania Company trustee thereof, and at the audit it appeared that it received some compensation for such service. The amount of this compensation was raised in the argument before us and the parties have filed a stipulation to the effect that the trust company was paid one dollar for certifying each of the $1000 bonds. Its compensation for certifying each of the three bonds belonging to this estate was one dollar or one-tenth of one per cent., or three dollars in all. The exceptant argues that the trustee (she really means one of the trustees, for there is no suggestion that the individual cotrustee had any interest in the small fee) loaned $3000 of this estate's funds to gain a commission of one-tenth of one per cent., and hence was in a dual position—one of which is adverse to its position as trustee.

A trustee is not permitted to deal with trust property so as to gain any advantage beyond its lawful compensation: 3 Pomeroy's Equity Jurisprudence 2468, Sec. 1075 (4th ed.). This rule should and will be rigidly enforced, but we know of no case where its application was requested where a fee of one-tenth of one per cent. was paid for certifying the bonds. The principle of de minimis is rather to be applied.

It might be a wise practice for a trust company to refuse to purchase for its trust estates any bonds wherein it is acting as trustee under the deed securing the same.

There yet remains for consideration: (4) Were these Ulrich bonds a valid legal investment? and (5) was the investment a prudent one?

4. As to the principal question—were the Ulrich bonds a valid legal investment?

We agree with the auditing judge that section one of the Act of June 29, 1923, P. L. 955, amending section forty-one of the Act of June 7, 1917, P. L. 447, does not offend article three, section twenty-two, of the Constitution of this state, and for the reasons given by him.

The Forrest Theatre property was conveyed to a strawman, who created the bonds and mortgage, which in turn were guaranteed by the real owner of the theatre—the Shubert Theatre Corporation.

An examination of the mortgage deed discloses that the holders of the bonds have no individual right of action; the bonds are payable to bearer, and, except when registered, they pass by delivery and not by assignment; in case of default the trustee is alone entitled to foreclose, and it may sit mute unless the owners of twenty per cent. of the bonds request the trustee to proceed, and then they

must deposit their bonds and indemnify the trustee against all expenses; the trustee is relieved from all responsibility for the validity of the proceeding authorizing the execution of the bonds or of the mortgage; if the mortgagor fails to maintain the insurance the trustee may insure—but "without any duty to do so;" the mortgagor is required to pay all taxes and produce tax receipts before December 1st of each year, but the trustee "shall be under no obligation to inquire into the payment of such taxes . . . or to require evidence of such payment;" and sections three and four of article five specifically and generally release the trustee from all obligations except as to money or property which has actually come into its hands.

It should be noted that the purchasers of these bonds have surrendered all individual right of action and administration of the investment, and while the trustee may perform them it is released from all obligation in connection therewith.

There is a grave question as to whether the so-called trustee, released from most of its duties, is such a trustee as was contemplated by the Act of June 29, 1923, P. L. 955. The Oxford Dictionary defines a trustee as one who is held responsible for the preservation and administration of anything.

We are relieved from passing upon this question because the trustee under the mortgage deed had submitted the same to competent counsel—Saul, Ewing, Remick & Saul—who advised the said trustee that these bonds, when executed and certified, would be a legal investment for trust funds in Pennsylvania. This opinion in full will be found in the record. The trustees of this estate were justified in relying upon that opinion. See Lawall v. Groman, 180 Pa. 532; Dempster's Estate, 308 Pa. 153.

5. Were these bonds a prudent investment?

When the mortgage for $600,000 was executed, the property was duly appraised at $1,050,000, so that the mortgage was for slightly less than sixty per cent. of the appraised value. The Forrest Theatre was new at the time, and instead of relying on the earnings the trustees received the guaranty of the Shubert Theatre Corporation, whose balance sheets of earnings and of assets and liabilities were presented to the trustees and proved satisfactory to them. The auditing judge has found that the trustees exercised due prudence in making this investment, and in this we agree.

The exceptions are dismissed, and the adjudication is confirmed absolutely.